YODER ET AL. *v.* PARCELL ET AL.

[No. 26,438.   Filed March 28, 1934.]

*Dunten & Dunten, Harmon & Wider,* and *John G. Yeagley,* for appellants.

*Ray Deahl* and *Luke H. Wrigley,* for appellees.

FANSLER, J.—The appellee Parcell filed his complaint below seeking to recover for the wrongful conversion of seventy-one head of hogs.   All of the other parties to this appeal were made defendants.   There was a verdict and judgment for plaintiff in the sum of $3,500.00 against appellants, and a verdict and judgment for the defendants, Lantz and Lantz.

Numerous errors are assigned; among others, that the

court erred in overruling appellants' motion for a new trial, which assigns, among other things, that the verdict was not sustained by sufficient evidence.

From the evidence most favorable to the plaintiff below, it appears that in April, 1927, and for some time prior thereto, appellees, Lantz and Lantz, were engaged in the business of feeding hogs on a farm owned or controlled by them in St. Joseph County, and upon two other farms; that the hogs were fed upon garbage brought from the City of South Bend or elsewhere, and delivered upon the farms without cost to Lantz Brothers; that they purchased their hogs from the King Pig Company of St. Paul, Minnesota; that the plaintiff Parcell had been acquainted with Lantz Brothers for a considerable time, and that they were indebted to him in an amount approximating $1800.00. In April, 1927, the plaintiff approached Ephriam C. Lantz seeking payment of the amount due him. Lantz suggested that plaintiff buy some hogs, and that he and his brother would feed them; that the feed cost nothing; that the hogs should be left with them until ready for sale, and when sold the amount secured over what plaintiff paid would be applied upon Lantz Brothers' indebtedness to plaintiff; or, as Lantz put it, he told Parcell that if the latter would put up the money to buy a deck of hogs, Lantz would feed them out and let Parcell take the profit to apply on the debt.

The plaintiff testified that in April, 1927, he bought seventy-one head of hogs of Lantz Brothers; that they got the hogs from the King Pig Company, and that they arrived on April 18; that on April 26 he paid $1400.00, by check, for the hogs; that there were 113 hogs in the car when it arrived. A certain Mr. Rector came into the transaction, and it was agreed that with him plaintiff should purchase a certain car of hogs being shipped from the King Pig Company which would ar-

rive about the 18th of April. The car loaded with 113 hogs arrived on that date and was unloaded on the Lantz farm in a separate lot. On the following Saturday plaintiff went to the farm; the hogs were that day turned in with other hogs, about 700 in all. Lantz pointed out some hogs and said: "There is the main bunch of the carload." Nothing further was ever done about selecting, or pointing out, or marking, or delivering any hogs to the plaintiff. Nothing further was done until the 10th day of May, when the following agreement was entered into:

"THIS ARTICLE OF AGREEMENT, made and entered into by and between L. O. Parcell and O. V. Rector, of Goshen, Indiana, parties of the first part, and E. C. Lantz of Goshen, Indiana, and Alva Lantz of LaPorte, Indiana, parties of the second part, WITNESSETH:

"That parties of the first part have furnished and delivered to parties of the second part One Hundred Fourteen (114) hogs on April 18, 1927, on what is known as the South Bend Hog Farm, owned and controlled and operated by parties of the second part, which hogs were delivered to said second parties for the purpose of being fed and fattened for future market, and when said hogs are fattened and ready for market, parties of the first part agree to sell and dispose of the same.

"Parties of the second part agree to furnish all feed and labor in the care and feeding of said hogs and when said hogs are sold by parties of the first part, second parties shall be entitled to the money derived from the sale of said hogs after deducting the costs of the same plus any freight or delivery charges at the time said hogs were delivered, together with further deduction of the costs of delivering said hogs to market, and that the difference between all of said costs and the money received from the sale of same shall be the consideration of second parties for the feeding and care of said hogs and that said money shall be credited upon promissory notes executed by second parties now held by first parties as a part payment on said notes.

"Parties of the second part hereby agree to use due care and diligence in the care and feeding of said hogs but are not herein held responsible for the death of any of said hogs by disease or otherwise.

"It is further agreed herein that when said hogs are ready for market and sale that parties of the first part shall consult with second parties as to the sale of said hogs and to receiving the best market price obtainable for the same.

Witness our hands this 10th day of May, 1927. Executed in triplicate.

(Signed)    E. C. LANTZ,
ALVA LANTZ,
O. V. RECTOR,
L. O. PARCELL.

It is further agreed that parties of the first part share in the investment as follows: L. O. Parcell 3/5 and O. V. Rector 2/5."

On that day Rector gave his check to Lantz Brothers for $950.00, but afterwards stopped payment on the check. When Rector repudiated his check, Lantz asked plaintiff whether he wanted to go on with his part of the contract. Plaintiff agreed that he would, and paid $150.00 more on May 11. He testified that his portion of the carload of hogs was to be divided off. He afterwards made a computation by which he concluded that 71 of the 113 hogs were his. If this was acquiesced in by Lantz it was orally.

The following questions were asked and answered by plaintiff:

"Q. Didn't you state to the jury Friday that that contract was taken by reason of the conversation when you said you would advance them or get somebody to advance them money to pay for this carload, and that then they could take the profit and apply it on the debt that they owed you?

A. That was the agreement; yes.

Q. Well, you understood you were taking it to secure your indebtedness, didn't you?

A. Not as a mortgage.

Q. I didn't ask you as a mortgage. Weren't you taking the contract for the purpose of securing the indebtedness that Lantz brothers owed you?

A. To get my money back; yes."

And the following questions and answers:

"Q. Did you know that the King Pig Company had a chattel mortgage on these hogs?

A. No, sir.

Q. Did you know that they were shipped with a reservation of title, holding title in the hogs?

A. No, sir.

Q. You learned that subsequently, didn't you?

A. Yes, later on."

Lantz testified that the carload of hogs in question was one of several purchased by them from the King Pig Company, for which they executed separate notes as the carloads arrived, the amount of which notes were consolidated into one, for which a chattel mortgage on all of the hogs in all of the shipments was given on May 24, and immediately recorded. The money which the plaintiff paid Lantz was not used in the purchase of the hogs, but used for some other purpose.

During this time, Lantz and Lantz were indebted to Yoder and Yoder, and on the 10th day of June entered into a contract with them which recited that, whereas, Lantz and Lantz were obligated by contract with the city of Mishawaka and the city of South Bend to care for all garbage of each city, which they were feeding to hogs upon their real estate described, and which was the farm on which the hogs in question were located; and, whereas, they were indebted to Yoder and Yoder, and were in need of money to pay interest due upon mortgages, and taxes, and insurance, and repairs and improvements necessary to hold and keep said real estate mortgages from being foreclosed; and, whereas, they were not financially able to purchase hogs and pigs to consume all of the garbage delivered to said farm, and Yoder and Yoder believed they could secure the hogs

necessary for that purpose, Yoder and Yoder were granted the privilege of placing hogs on the real estate, which should remain their property; that Lantz and Lantz would look after the pigs and hogs and properly care for them until finally disposed of. It was agreed that when the hogs put on the farm by Yoder and Yoder were sold, the proceeds should be used in paying the cost price thereof to Yoder and Yoder, with interest, the necessary expenses of the care, attention, and delivery to market, and any interest on notes, taxes, insurance and repairs, incident to the real estate, paid or contracted by Yoder and Yoder, and the balance applied on the debts due Yoder and Yoder from Lantz and Lantz. Lantz and Lantz reserved the right to keep upon said farm the pigs and hogs located thereon, "which pigs and hogs now were furnished by King Pig Company of St. Paul, Minnesota, as evidenced by a Chattel Mortgage executed by first parties to King Pig Company, May 24th, 1927, and recorded in Chattel Mortgage Record 62, page 236 of the records of St. Joseph County, Indiana."

Thereafter, on June 10, 1927, Lantz and Lantz, by written assignment and bill of sale, transferred to Samuel A. Yoder all of the pigs and hogs located on the farm, and upon a certain farm between LaPorte and Michigan City, and upon a certain farm in Lagrange County, subject to the chattel mortgage in favor of the King Pig Company, and represented therein that they had a good title to said property, save and except the above mortgage, and that the hogs were otherwise free from all liens, claims, and encumbrances.

We find no evidence that Yoder and Yoder or Salig had any notice of any kind that plaintiff was claiming any right, title, or interest in any hogs, before the 10th day of June, or, in fact, before some time in July.

The note of the King Pig Company, secured by chattel mortgage on the hogs, including those in question, was

due September 15. The hogs were taken off the farm and sold on various dates in September, beginning on the 3rd, and six payments, representing six different shipments, were made to the King Pig Company, totaling $20,507.49. The notes and mortgage were sent to Tobias Yoder and by him delivered to Lantz and Lantz. Tobias Yoder testified that at the time the hogs were sold, Lantz asked Salig to wire the King Pig Company that he had sold the hogs, and to inquire what was to be done with the money. Yoder testified that Alva Lantz told him to look after them, and Samuel Yoder told him to look after him, and the King Pig Company had told him to look after their interests, and that in selling the hogs he was looking after those interests; that he received none of the money except $1,496.00, $980.00 of which he delivered to Samuel Yoder; that the money from the hogs was turned over to the Citizens Bank of Ligonier, and that the bank had the King Pig Company's money sent to St. Paul. The King Pig Company had a representative at the farm looking after the hogs for some time before they were sold. It appears that the Salig payments were made to the bank, and for them were issued drafts, including those directly to the King Pig Company. One of the loads of hogs shipped was from the LaPorte farm, and another from the farm in Lagrange County.

The negotiations between the plaintiff and Lantz Brothers originated not in a desire on the part of the plaintiff to purchase hogs from them, nor a desire upon their part to sell hogs to the plaintiff, but in the desire that he be paid the indebtedness due him from Lantz Brothers. It was represented to him that if he would advance money with which to buy more hogs, which they could feed upon the garbage which cost nothing, upon the sale of the hogs, the money advanced would be returned, and the profit paid to him by Lantz Brothers as

a payment upon his note. Plaintiff was to take no profit whatever from the handling of the hogs. The carload of hogs in question was purchased from the King Pig Company by Lantz Brothers, and not by the plaintiff. Plaintiff claims to have purchased the hogs from Lantz Brothers, and not from the King Pig Company. Whatever tentative agreements were made between the plaintiff and Lantz Brothers prior thereto were merged in the written contract between the plaintiff and Rector, as parties of the first part, and Lantz Brothers, as parties of the second part, on May 10, 1927. Rector repudiated this contract, and his repudiation was acquiesced in by the other parties. Lantz Brothers cannot be considered as substituted for Rector, since in that event they would be parties of the first part as well as parties of the second part. They cannot contract with themselves, and the subsequent agreements between plaintiff and Lantz Brothers must be treated as a new contract, by the terms of which he was considered as having paid for that number of hogs in the shipment in question which bore the relationship to the whole number that the amount of money which he paid bore to the cost of the entire carload. The parties so interpreted their agreement, and both the plaintiff and one of the Lantz Brothers, by their testimony, indicated that they considered the plaintiff as having contracted for seventy-one hogs. Such a construction of the contract is the most favorable one to the plaintiff that can be supported by the evidence. It is contended by the plaintiff appellee that there was a delivery of his hogs to him, and to support this contention he argues that when he went to the hog farm on Saturday following the receipt of the hogs, the carload in question had just been turned in to the main herd, and that Lantz pointed out some of them, and said: "There is the main body of the shipment there," although at the time the 113

hogs were in the same field, and, at least partly, commingled with the other hogs. But, since, under the most favorable construction of his contract, he only purchased seventy-one hogs, there is no evidence that they were ever isolated, identified, separated, or set aside from the shipment of 113 hogs, if, in fact, there can be said to be substantial evidence that the 113 were identified in the entire herd of seven hundred.

It is well-settled that a sale of personal property constituting a part of a mass of like property, passes no title to the purchaser until it has been separated from the mass in some manner that would designate the particular items sold. *Commercial Nat'l. Bank* v. *Gillette* (1883), 90 Ind. 268; *Dehority* v. *Paxson et al.* (1884), 97 Ind. 253; *S. Breakstone and Co.* v. *Gen. Parts Corp. et al.* (1928), 87 Ind. App. 55, 160 N. E. 47.

Since there was no separation of the hogs, title to the seventy-one hogs did not pass to the plaintiff, and, therefore, the mortgage to the King Pig Company was a valid mortgage and a lien on all of the hogs in the shipment, including those claimed by plaintiff; and the bill of sale to Samuel A. Yoder, and the delivery of the hogs to him thereunder, passed title to him.

The question is the same as though the plaintiff had been asserting title superior to that of the King Pig Company. The action is for conversion. Samuel Yoder's testimony that in the sale of hogs he was looking after the interests of all parties, including the King Pig Company, is not disputed, nor is it disputed that all of the purchase price was applied to the payment of their mortgage until it was entirely paid. There was no effort to allocate the hogs claimed by plaintiff to any of the shipments made when the hogs were sold, nor would it be possible under the evidence to have identified them

as part of any shipment. So far as the evidence shows, the hogs claimed by the plaintiff, if they could have been identified, might have been shipped by Yoder for the benefit of the King Pig Company and the proceeds paid to them. Most of the money from the proceeds of the hogs from the farms went to the King Pig Company, and only a comparatively small amount reached the hands of the appellants, Yoder and Yoder.

Third parties whose rights intervened are not bound by the written contract between the plaintiff and the Lantzes, but their rights will be determined in the light of the true facts concerning the relationship of the parties, and evidence is not lacking to support the theory that, while the contract on its face showed a sale of hogs, the true facts were that the plaintiff advanced money with which he expected the Lantzes to buy hogs from which they, not he, would make a profit, and that upon sale of the hogs they would return his money and apply their profits to the payment of their previous obligations to him; that the hogs were never intended to be separated.

Construing the evidence most favorable to appellee Parcell, it cannot be said to show that he ever had title to any of the hogs in question.

In view of our conclusion, it is not necessary to discuss the many other questions presented, since they will not arise upon another trial.

The judgment is reversed, with instructions to sustain the appellants' motion for a new trial.